## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Michael Shannon Franks, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services LLC | ) | **COMPLAINT** |
| and Associated Credit Union, | ) | **WITH JURY TRIAL DEMAND** |
| | ) | |
| Defendants. | ) | |

## PRELIMINARY STATEMENT

1.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.      Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum

1

possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.    Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

4.    Defendants compile, maintain, and report information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of

2

insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

5.     This action for damages is based on Defendants' false reporting on Plaintiff's credit file and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

6.     Plaintiff, Michael Shannon Franks, is a natural person who resides in Gwinnett County, Georgia.

7.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3

8.     Defendant, Equifax Information Services, LLC (hereinafter "Equifax"), is a limited liability company formed under the laws of the State of Georgia. Equifax may be served with process via its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

9.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

10.     Defendant, Associated Credit Union (hereinafter "Associated") is a corporation formed under the laws of the State of Georgia. Associated may be served with process via its registered agent, Tim Bridges, at 6251 Crooked Creek Road, Norcross, Georgia 30092.

11.     Associated regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

4

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

13.     This Court has personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

14.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

15.     Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

### Plaintiff's Bankruptcy Case

16.     On December 4, 2017, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 17-70962 (the "Bankruptcy Case").

17.     In Schedule D of his Bankruptcy Petition, Plaintiff listed Associated as a secured creditor with a claim in the amount of $7,130.00 (the "Debt").

18.     The Debt is collateralized by a 2012 Kia Sorrento.

19.     On February 21, 2018, Plaintiff filed his Chapter 13 Plan in accordance with 11 U.S.C. § 1322, reforming any pre-existing contract with Associated and setting forth his proposed treatment of the Debt owed to Associated, including detailed payment terms.

20.     Plaintiff's Plan provided, in part, that Associated's allowed claim would be paid through the Chapter 13 Trustee and that no payments would be forthcoming from any other source.

21.     On December 28, 2017, Associated filed a Proof of Claim in Plaintiff's Bankruptcy Case, claim number 3, representing it was owed $6,796.32.

22.     Following confirmation, Associated was bound by the terms of the Plan, including the provisions controlling payment of its claim, in accordance with 11 U.S.C. § 1327(a).

23.     A confirmed plan constitutes a new contract between the debtor and creditors, and thereafter, a creditor's rights are defined by the confirmed plan. Consequently, a pre-petition claim provided for in a confirmed plan is no longer a pre-petition claim. The claim is a right to payment arising from the confirmed plan.

24.     Associated did not object to Plaintiff's Plan.

25.     On April 3, 2018, Plaintiff's Plan was confirmed.

26.     Associated was served with a copy of the Order Confirming Plan on April 5, 2018, by the Bankruptcy Noticing Center.

27.     The Bankruptcy Case is currently pending and Plaintiff continues to substantially perform under the terms of his Confirmed Plan.

## Effect of Consumer Reports Which Contain Inaccurate or Misleading Information

28.     Under the FCRA, the term "consumer report" generally refers to:

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for

7

the purpose of serving as a factor in establishing the consumer's eligibility for:

    i.     credit or insurance to be used primarily for personal, family, or household purposes;

    ii.    employment purposes; or

    iii.   any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

29.    The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

30.    The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

    a.    Eligibility for and terms for credit;

    b.    Potential for refinancing of existing credit;

    c.    Eligibility for leasing prospects;

    d.    Eligibility for utility services;

    e.    Eligibility for and the terms of insurance;

    f.    Employment or potential employment;

    g.    Accounts which are under collection or review;

      h.     Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

      i.      Standing with potential investors or servicers; and

      j.      Eligibility for individually-billed travel charge cards used by executive departments and agencies.

31.     The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

32.     Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on September 3, 2018).

33.     In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent

of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on September 3, 2018).

34.   The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

## Credit Scoring

35.   The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on September 3, 2018).

36.   The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

37.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on September 3, 2018).

38.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed September 3, 2018).

11

39.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

40.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

41.    Incorrectly reporting the tradeline of Plaintiff's Debt—which is provided for by Plaintiff's Confirmed Bankruptcy Plan—as past due, without also properly noting that the Debt is included in and subject to Plaintiff's Bankruptcy Case, adversely affects Plaintiff's FICO score, as it negatively misrepresents the Debt owed by Plaintiff.

42.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point

change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

43.     Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/, *archived at* https://perma.cc/9TQN-S5WP (last accessed September 3, 2018).

*Credit-Based Insurance Scoring*

44.     Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

45.     Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

46.     Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal

Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at

https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf, *archived at* https://perma.cc/B2VQ-452N (last accessed September 3, 2018). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

47.    Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

48.    A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed September 3, 2018).

14

49.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See    https://www.consumer.ftc.gov/articles/0152-credit-scores, *archived at* https://perma.cc/EB3D-54UP (last accessed September 3, 2018).

50.     The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, http://www.naic.org/index_about.htm (last accessed September 3, 2018).

51.     The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed September 3, 2018).

52.     There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation. In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

53.     The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in that calculation: payment history accounts for 40% of a consumer's of a consumer's FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

54.     Incorrectly reporting the tradeline of Plaintiff's Debt—which is provided for by Plaintiff's Confirmed Bankruptcy Plan—as past due, without also properly noting that the Debt is included in and subject to Plaintiff's Bankruptcy Case, adversely affects Plaintiff's FICO credit-based insurance score, as it negatively misrepresents the debt/amounts owed by Plaintiff.

16

## The CDIA Metro 2 Credit Reporting Standards

### *The CDIA has Imposed Rigorous Industry Standards to Ensure FCRA Compliance*

55.    The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Between two and three million consumer reports are issued by credit bureaus each day. See, http://www.cdiaonline.org/about.cfm (last accessed September 3, 2018).

56.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

57.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works

together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

58.     To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

59.     The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

60.     Because standardized methods are of paramount importance to the accurate, complete and timely reporting of consumer credit data, the CDIA can and will revoke FCRA certification for failure to adhere to the standards set by the CDIA.

61.     In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See,     http://www.cdiaonline.org/about/index.cfm?unItemNumber=515     (last accessed September 3, 2018).

62.    The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete and timely data, and has developed the Metro 2 standards. *Id.*

63.    In order to ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the "Metro2 standard") for reporting consumer accounts that "will ensure the integrity and consistency of the credit information being reported."

64.    In the credit reporting industry, Metro 2 is widely known as the well-established industry standard, uniformly adopted by furnishers and CRAs alike.

65.    As such, viewers/users of consumer reports both expect and rely on the information contained in consumer reports to be reported in compliance with the Metro 2 standards.

66.    A deviation from the Metro 2 standards results in a reported item being incomplete and/or misleading to viewers/users of consumer reports.

67.    In fact, the existence of an "industry standard" itself—one which is uniformly adopted and contractually enforced—compounds errors because it gives more credibility to false reporting.

68.     Without the existence of Metro 2, a viewer/user of consumer reports *might* presume that the furnisher or CRA simply made a mistake with respect to erroneous, negative credit reporting.

69.     However, since viewers/users of consumer reports know that Metro 2 has layers of rules and checks to ensure accuracy, they are more likely to "blame" the consumer for the false, negative credit reporting.

70.     Thus, a deviation from the Metro 2 standards results in adverse consequences for the consumer.

71.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

72.     15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute,

15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

73.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure that they are in compliance with their respective duties to ensure that they maintain complete and accurate information under the FCRA.

74.    The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

75.    The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

76.    As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

77.    At all times relevant hereto, Equifax adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

78.    At all times relevant hereto, Equifax has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

79.    As an integral aspect of its duties under the FCRA, Associated is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

80.    At all times relevant hereto, Associated adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

81.    Furthermore, at all times relevant hereto, Associated incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

*The National CRAs and the Furnishers of Consumer Information Communicate Metro 2 Compliant Notices of Consumer Disputes and Responses, Respectively, Through the e-Oscar Reporting Platform*

82.    The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

83.    To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

84.    The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed October 30, 2018).

85.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

86.    The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

87.    If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

88.    The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed February 19, 2019).

89.    Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

90.    Equifax requires data furnishers that report to Equifax to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and

Metro 2 standards." See, *https://www.transunion.com/data-reporting/support-teams* (last accessed October 30, 2018).

*Viewers of Credit Reports Presume Compliance with the Metro 2 Standards; Departures from the Standards are, Therefore, Inherently Misleading*

91.     The CRRG and the Metro 2 guidelines have been uniformly adopted across the credit reporting industry.

92.     All entities which contribute to consumer reports have agreed to comply with the Metro 2 guidelines, which are "accepted by all consumer reporting agencies;" likewise, consumer reporting agencies require their furnishers to comply with the Metro2 guidelines as a condition of their agreements. CRRG at 2-1.

93.     Given the universal adoption of Metro 2, a creditor or other entity performing risk scoring or other functions using the data provided in a consumer report will view the report in the light of the guidelines, presuming that the information reported is in compliance with industry standards.

94.     For example, The FICO scoring system utilizes data reported by CRAs and furnishers which are, ostensibly, in compliance with Metro 2 standards.

95.     As Metro 2 format has been adopted as the credit reporting industry standard, the failure on the part of a CRA to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to

viewers of consumer reports, as those users reasonably presume that the information in the consumer reports is being reported in compliance with Metro 2 standards, and interpret that information accordingly.

96.    Thus, failure to adhere to Metro 2 in consumer credit reporting adversely affects consumers, as it causes inconsistent, misleading, and/or incorrect interpretation of information regarding consumers.

97.    Equifax has actual knowledge that entities reviewing consumer credit reports presume that Equifax has complied with the Metro 2 standards.

98.    Associated has actual knowledge that entities reviewing consumer credit reports presume that Associated has complied with the Metro 2 standards.

99.    Because users of consumer credit reports presume the information in those reports complies with the Metro 2 standards, the failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to users of consumer reports, and thus adversely affecting the consumer.

100.   The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as

described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

101.   Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

### *The Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

102.   As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

103.   Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

### *The Significance of the Consumer Information Indicator*

104.   Of particular importance in reporting under the Metro2 standards is the Consumer Information Indicator ("CII"), a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

105.   Furnishers and CRAs are required to update the CII code when a petition for bankruptcy is filed, and again when the bankruptcy is discharged, dismissed, or withdrawn.

106.   The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case, and can suppress other statements about the account (i.e., "in collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

107.   While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

108.   This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

109.   The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

110.   Similarly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely indicate that the account is subject to bankruptcy or discharge, and suppress the consumer's positive history of making payments toward the account.

111.   These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

112.   Since the broadly adopted industry standard requires disclosure of a pending bankruptcy, the absence of such a disclosure inherently misleads a viewer into believing that the account is not included in bankruptcy.

*Reporting of Accounts with an Active, Confirmed
Chapter 13 Bankruptcy, under Metro 2*

113.   Upon confirmation of a Chapter 13 plan, Metro 2 requires furnishers and CRAs to report an account included in the debtor's bankruptcy as follows:

a.     A **Consumer Information Indicator** ("CII") of "D" (or blank to maintain a "D" which was previously reported), indicating that the account is subject to a petition for Chapter 13 bankruptcy;

b.     An **Account Status Code** reflecting the status at time of the petition;

c.     A **Payment History** of "D" (indicating "no history available") for each month since the filing of the bankruptcy, plus actual history for prior months;

d.     An **Amount Past Due** of zero;

e.     A **Current Balance** reflecting the current balance as provided for under the terms of the Chapter 13 plan, rather than the original contract;

f.     **Terms Duration & Terms Frequency** which incorporate any changes the contract terms provided for under the Chapter 13 plan;

g.     The **Scheduled Monthly Payment Amount** reflecting the scheduled payment amount under the Chapter 13 plan, rather than under the original contract; and

30

    h.  A **Date of Account** Information of the current month's date

    (increasing with each month's reporting).

    CRRG, FAQ 28(a)-(b), at 6-21 to 6-24.

**Plaintiff's Equifax Consumer Report**

  114. On or about July 24, 2020, Plaintiff obtained a copy of his consumer

report as published by Equifax.

  115. That report contained erroneous information as provided by

Associated, and as published and reported by Equifax.

  116. The relevant portion of the Associated tradeline appeared in the July

24, 2020 Equifax report as follows:

**4.2 ASSOCIATED CREDIT UNION**

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| | |
|---|---|
| Account Number | xxxxxxxxxx 0052 |
| Account Status | OVER_120_DAYS_PAST_DUE |
| Available Credit | |
| Reported Balance | $3,935.00 |

| | |
|---|---|
| High Credit | $19,689.00 |
| Owner | JOINT_CONTRACTUAL_LIABILITY |
| Credit Limit | |
| Account Type | INSTALLMENT |
| Terms Frequency | MONTHLY |
| Term Duration | 6 |
| Balance | $3,935.00 |
| Date Opened | 04/14/2014 |
| Amount Past Due | $1,368.00 |
| Date Reported | 02/01/2020 |
| Actual Payment Amount | $253.00 |
| Date of Last Payment | 02/01/2020 |
| Date of Last Activity | |
| Scheduled Payment Amount | $245.00 |
| Months Reviewed | 70 |
| Delinquency First Reported | |
| Activity Designator | |
| Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | |
| Charge Off Amount | ( |
| Balloon Payment Date | . |
| Balloon Payment Amount | |
| Loan Type | Auto |
| Date Closed | |
| Date of First Delinquency | 01/01/2018 |
| Comments | |
| 180 days or more past due | |
| Contact | |
| ASSOCIATED CREDIT UNION | |

(Remaining portion of tradeline omitted.)

117. Because the Debt is included in Plaintiff's Bankruptcy Case and provided for in the Confirmed Plan, the information described above was both false

32

and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

      a.    The Debt's current status is reported as "Over 120 Days Past Due" rather than as "Included in Bankruptcy"; and

      b.    The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case or that the Debt is included in and subject to the Bankruptcy Case; and

      c.    The tradeline was not reported in compliance with CDIA / Metro 2 standards.

118.    The Inaccurate Reporting was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

      a.    The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case, or the fact that the Debt is included in and subject to the Bankruptcy Case, and instead lists a status of "Over 120 Days Past Due", which indicates that the furnisher did not report a CII of "D" as required by Metro 2; and

b.    The Balance Owed is $3,935.00, rather than $0, the balance provided for under the Confirmed Plan, as required by Metro 2; and

c.    The Amount Past Due is $1,368.00, rather than $0, as required by Metro 2; and

d.    The Scheduled Monthly Payment is $245.00, rather than $0, the scheduled monthly payment for under the Confirmed Plan, as required by Metro 2; and

e.    The payment history indicates the reporting of values other than "D" during the course of the Bankruptcy, in violation of Metro 2.

119.   In a letter dated November 13, 2020, Plaintiff disputed the inaccurate and misleading information directly to Equifax and advised Equifax that his account with Associated was included in his active Bankruptcy case and he has never missed a payment on the account. The relevant portion of Plaintiff's dispute is reproduced below:

My account with Associated Credit Union, 6251 Crooked Creek Dr, Peachtree Corners, Georgia 30092, account number xxxxxxxxx0052 is included in my active bankruptcy case filed on December 4, 2017, case number 17-70962. I am including the notice documents from the court for your review. The "status" for the account should be corrected to reflect its inclusion in that case, and it should not be reporting as past due, as I have never missed a payment on this account. Please contact Associated Credit Union to verify this information and correct this entry.

120.   The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

121.   In support of Plaintiff's dispute, and to assist Defendants' respective investigations, Plaintiff included with his dispute the following documents: a copy of Plaintiff's Chapter 13 Plan; a copy of the Order of Confirmation of Plaintiff's Chapter 13 Plan; a copy of the Meeting of Creditors; and a copy of his Payment History with the Associated account.

122.   Equifax failed to provide Plaintiff with a timely response to his November 13, 2020 dispute letter.

123.   On or about February 2, 2021, Plaintiff obtained another copy of his consumer report as published by Equifax.

124.   That report continued to report the erroneous information as provided by Associated, and as published and reported by Equifax.

125.   The relevant portion of the Associated tradeline appeared in the February 2, 2021 Equifax report as follows:

## 4.1 ASSOCIATED CREDIT UNION

### Summary

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | xxxxxxxxxx 0052 | Reported Balance | $1,227 |
|---|---|---|---|
| Account Status | OVER_120_DAYS_PAST_DUE | Debt-to-Credit Ratio | 6% |
| Available Credit | | | |
| | | | |
| High Credit | $19,689 | Owner | JOINT_CONTRACTUAL_LIABILITY |
| Credit Limit | | Account Type | INSTALLMENT |
| Terms Frequency | MONTHLY | Term Duration | 6 |
| Balance | $1,227 | Date Opened | Apr 14, 2014 |
| Amount Past Due | $1,227 | Date Reported | Jan 31, 2021 |
| Actual Payment Amount | | Date of Last Payment | Dec 01, 2020 |
| Date of Last Activity | | Scheduled Payment Amount | $245 |
| Months Reviewed | 81 | Delinquency First Reported | |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Auto | Date Closed | |
| Date of First Delinquency | Jan 01, 2018 | | |

| Comments | Contact |
|---|---|
| 180 days or more past due | ASSOCIATED CREDIT UNION |

(Remaining portion of tradeline omitted.)

126.   Because the Debt is included in Plaintiff's Bankruptcy Case and provided for in the Confirmed Plan, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

a.   The Debt's current status is reported as "Over 120 Days Past Due" rather than as "Included in Bankruptcy"; and

36

      b.     The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case or that the Debt is included in and subject to the Bankruptcy Case; and

      c.     The tradeline was not reported in compliance with CDIA / Metro 2 standards.

127.   The Inaccurate Reporting was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

      a.     The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case, or the fact that the Debt is included in and subject to the Bankruptcy Case, and instead lists a status of "Over 120 Days Past Due", which indicates that the furnisher did not report a CII of "D" as required by Metro 2; and

      b.     The payment history indicates the reporting of values other than "D" during the course of the Bankruptcy, in violation of Metro 2.

128.   In a letter dated February 11, 2021, Plaintiff again disputed the inaccurate and misleading information directly to Equifax and advised Equifax that

his account with Associated was included in his active Bankruptcy case and he has never missed a payment on the account. The relevant portion of Plaintiff's dispute is reproduced below:

> Also, my account with Associated Credit Union, 6251 Crooked Creek Drive, Peachtree Corners, Georgia 30092, account number xxxxxxxxxx0052 is included in my active bankruptcy case filed on December 4, 2017, case number 17-70962. I am including the notice documents from the court for your review. The "status" for the account should be corrected to reflect its inclusion in that case, and it should not be reporting as past due, as I have never missed a payment on this account. Please contact Associated Credit Union to verify this information and correct this entry.

129.   The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

130.   In support of Plaintiff's dispute, and to assist Defendants' respective investigations, Plaintiff included with his dispute the following documents: a copy of Plaintiff's Chapter 13 Plan; a copy of the Order of Confirmation of Plaintiff's Chapter 13 Plan; a copy of the Meeting of Creditors; and a copy of his Payment History with the Associated account.

131.   Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Associated of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for Associated's review,

38

to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

132.   Upon information and belief, Equifax timely notified Associated of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

133.   Alternatively, Equifax failed to notify Associated of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

134.   Upon information and belief, Associated received timely notice of Plaintiff's dispute from Equifax.

135.   Pursuant to 15 U.S.C. § 1681s-2(b), Associated had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

136.   In a document dated March 6, 2021, Equifax advised Plaintiff that it had researched the dispute, and provided a "revised report" that reflected its findings.

137.   Equifax advised Plaintiff it either made changes to Plaintiff's credit report based upon information provided by Plaintiff, or it contacted the company reporting the information to Equifax requesting that it verify the accuracy of the information provided by Plaintiff.

39

138.    Equifax also advised Plaintiff that it provided the furnisher with "any relevant information and supporting documentation you provided us with the dispute to consider as part of the investigation".

139.    A reproduction of the relevant portion of the report describing the procedures to Plaintiff appears below:

**Were changes made to my credit report and what actions were taken?**

Please see the following page(s) for more detailed information on your specific results.

If we were able to make changes to your credit report based on the information you provided, we have done so. Otherwise, we contacted the company reporting the information to Equifax for them to investigate your dispute.

In this situation:

- We request that the reporting company verify the accuracy of the information you disputed;
- We provide them with any relevant information and supporting documentation you provided us with the dispute to consider as part of the investigation; and
- We request that they send Equifax a response to your dispute and update their records and systems, as necessary.

140.    Equifax provided a copy of the tradeline as reported "post-investigation" which reproduced the errors identified by Plaintiff in his original dispute letter.

141.    Specifically, the Associated tradeline appeared in the revised March 6, 2021 Equifax report as follows:

40

| ASSOCIATED CREDIT UNION | 4251 CROOKED CREEK RD PEACHTREE CORNERS GA 30092-3107 : (770) 448-8200 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Account Number | Date Opened | High Credit | Credit Limit | Terms Duration | Terms Frequency | Months Revd | Activity Designator | Creditor Classification |
| 1000263314* | 04/14/2014 | $19,689 | | | Monthly | 81 | | |

| Items As of Date Reported | Balance Amount | Amount Past Due | Date of Last Payment | Actual Payment Amount | Scheduled Payment Amount | Date of 1st Delinquency | Date of Last Activity | Date Maj Del 1st Rptd | Charge Off Amount | Deferred Pay Start Date | Balloon Pay Amount | Balloon Pay Date | Date Closed |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 03/06/2021 | $1,227 | $1,227 | 12/2020 | $245 | $245 | 01/2018 | | | | | | | |

| Status | Type of Account | Type of Loan | Whose Account | Portfolio Indicator | Portfolio Status |
| --- | --- | --- | --- | --- | --- |
| Over 120 Days Past Due | Installment | Auto | Joint Account | | |

ADDITIONAL INFORMATION:
*Auto*

*180 Days or More Past Due*

142.   Defendants' post-investigation reporting is, independently and jointly, false and misleading.

143.   Defendants' post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

144.   There is no indication in the tradeline of the "verified" report that Plaintiff has disputed the information reported and published by Defendants, and the failure to note Plaintiff's legitimate dispute of the Associated tradeline renders the reporting materially misleading.

145.   Plaintiff is informed and believes that the revised tradeline reflects any information provided by Associated to Equifax in response to Plaintiff's dispute.

## INJURIES-IN-FACT

146.    Defendants' actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer report.

147.    The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

148.    Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

149.    The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than he otherwise would.

150.    Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue

her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged

a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

151.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

152.   The adverse effect on Plaintiff's credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than he otherwise would.

153.   Defendants' actions and omissions have falsely suggested to any viewer of Plaintiff's Equifax credit report that the Debt was over 120 days past due, rather than being provided for in Plaintiff's active Bankruptcy Case.

154.   This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's Equifax credit report engaged in judgment-based lending.

155.   Plaintiff's pending Bankruptcy Case does not preclude Plaintiff from obtaining credit. On the contrary, it is not uncommon for consumers in an active

Chapter 13 Bankruptcy Case to access the credit markets for the replacement or acquisition of vehicles and the refinancing of debt.[1]

## DAMAGES

### Actual Damages

156.   As a result of Defendants' actions and omissions, Plaintiff has suffered actual damages.

157.   These damages include out-of-pocket expenses incurred as a result of Defendants' wrongful representations regarding the Debt, and Defendants' failures to abide by their obligations under the FCRA.

158.   Plaintiff has suffered a decrease in Plaintiff's credit score as a result of Defendants' wrongful representations regarding the Debt, and Defendants' failures to abide by their obligations under the FCRA.

159.   Plaintiff has also experienced aggravation, frustration, and stress due to the fact that Defendants are thwarting Plaintiff from receiving the Fresh Start guaranteed by bankruptcy process and discharge.

---

[1] The Federal Rules of Bankruptcy Procedure specifically provide for the method by which consumers in an active bankruptcy obtain approval for obtaining credit. FRBP 4001(c).

## Statutory and Punitive Damages

160.   At the time Defendants reported the information at issue in this matter, each Defendant had actual notice that the information it was reporting regarding Plaintiff and the Debt was false, deceptive, and misleading.

161.   For example, Plaintiff included corroborating documents with his dispute, including the Chapter 13 Plan, the Order Confirming Plan, the Meeting of Creditors, and the Payment History for the Associated Account, which was more than sufficient to establish that the disputed information was being reported inaccurately.

162.   Additionally, the fact of Plaintiff's Bankruptcy Case, and the Debt's inclusion in it, is a matter of public record and can easily be independently verified.

163.   Furthermore, Associated was independently notified of the fact of Plaintiff's Bankruptcy Case by the Bankruptcy Noticing Center on several occasions, and still failed to correct Plaintiff's consumer reports to reflect the reporting of the Debt relative to the Bankruptcy Case.

164.   Finally, Plaintiff is informed and believes that Associated has previously provided Equifax with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Equifax on

46

notice of Associated's unreliability, and deficiencies in Associated's systems and procedures, which have repeatedly caused these errors to propagate in data provided by Associated and elude correction upon dispute by consumers.

165.   Each Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

166.   Despite that, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiff and the Debt.

167.   Each Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

168.   Accordingly, Defendants' conduct was willful.

169.   As a result of Defendants' willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. §§ 1681e(b) and 1681i
## Equifax Information Services, LLC

170.   Plaintiff incorporates by reference the preceding paragraphs as though fully stated herein.

171.   Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

172.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

173.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Plaintiff's disputes to Associated, including the forwarding of any documents provided by Plaintiff in support of that dispute.

174.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

48

175.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

176.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

177.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

178.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of Equifax's reporting of the Debt.

179.   Plaintiff provided all the relevant information necessary for Equifax to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

180.   Equifax breached its duties as described herein.

181.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's disputes, Equifax would have reviewed and considered all of the information Plaintiff submitted in his disputes, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

182.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's disputes, the Associated tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

183.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's Equifax report was not appropriately modified.

184.   Equifax had all the information necessary to correct its reporting. Despite that, Equifax failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Equifax's reinvestigation procedures were not reasonable.

185.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

186.   Upon information and belief, Equifax has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

187.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in his consumer reports, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

188.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Associated of Plaintiff's disputes, by failing to provide Associated with all the supporting information/documents included with Plaintiff's disputes, by failing to conduct a reasonable reinvestigation of Plaintiff's disputes, and by failing thereafter to appropriately modify information in Plaintiff's file and on his consumer reports, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

189.   As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore,

entitled to recover actual damages from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

190.   Equifax's actions and omissions were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

191.   Plaintiff is entitled to recover costs and attorneys' fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### Associated Credit Union

192.   Plaintiff incorporates by reference paragraphs 1 through 171 as though fully stated herein.

193.   Pursuant to 15 U.S.C. § 1681s-2(a), Associated is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

194.   Upon information and belief, Equifax timely notified Associated of Plaintiff's disputes, and provided Associated with all the relevant information that Plaintiff had submitted.

195.   Pursuant to 15 U.S.C. § 1681s-2(b), Associated had a duty to investigate Plaintiff's disputes and accurately report its findings to Equifax.

196.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

197.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

198.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

199.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Associated was required to review and consider all relevant information submitted by Plaintiff to Equifax.

200.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of reporting the Debt as over 120 days past due with a balance rather than included in Plaintiff's active Bankruptcy Case.

201.   Associated breached its duties as described herein.

202.   If Associated had conducted a reasonable investigation of Plaintiff's disputes, Associated would have reviewed and considered all of the information Plaintiff submitted to Equifax in his disputes, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

203.   If Associated had conducted a reasonable investigation of Plaintiff's disputes, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

204.   Due to Associated's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

205.   Associated had all the information necessary to correct its reporting. Despite that, Associated failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Associated's investigation procedures were not reasonable.

206.   The fact that Associated had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Associated

recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

207.   Associated willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's disputes from Equifax, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

208.   As a result of Associated's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from Associated under 15 U.S.C. §§ 1681n and 1681o.

209.   Associated's actions and omissions were willful, rendering Associated liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

210.   Plaintiff is entitled to recover costs and attorneys' fees from Associated pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

211.   Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in his favor and against Defendants, jointly and severally, for:

a)      Plaintiff's actual damages;

b)      Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)      Punitive damages pursuant to 15 U.S.C. § 1681n;

d)      Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)      Such other and further relief as may be just and proper.

Respectfully submitted this 14th day of May, 2021.

**BERRY AND ASSOCIATES**

*/s/ Joseph L. Erkenbrack*

Matthew T. Berry
Georgia Bar No. 055663
*matt@mattberry.com*

Joseph L. Erkenbrack
Georgia Bar No. 801728
jerkenbrack@mattberry.com

Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, Georgia 30324

OFFICE    (678) 996-5172
FAX       (678) 996-5198

Counsel for Plaintiff

57